[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 17-14546

————————————————

D.C. Docket No. 8:16-cv-00410-CEH-TBM

MARK A. SACCULLO,
as Successor Trustee of the Anthony L.
Saccullo Irrevocable Trust for the benefit
of Mark A. Saccullo,

Plaintiff-Counter Defendant-Appellant,

DOROTHY A. SACCULLO,

Counter Defendant-Appellant,

TAX COLLECTOR OF CHARLOTTE
COUNTY, FLORIDA,

Counter Defendant,

versus

UNITED STATES OF AMERICA,

Defendant-Counter Claimant-Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(January 11, 2019)

Before MARCUS, NEWSOM, and ANDERSON, Circuit Judges.

NEWSOM, Circuit Judge:

One relic of the English legal tradition holds that, as a general matter, the sovereign (here, the United States) is not bound by statutes of limitation or subject to laches. The question before us is how this vestigial rule—*nullum tempus occurrit regi*, or, as the parties here call it, the "*Summerlin*" principle, after *United States v. Summerlin*, 310 U.S. 414, 416 (1940)—interacts with a Florida law designed to correct technical flaws in property-conveyance deeds.

At issue in this case is whether Fla. Stat. § 95.231, which operates to cure certain defective deeds after the passage of five years, applies to a parcel on which the United States has asserted a federal estate-tax lien. Here's the (very) short story: In 1998, the appellant's aging father executed a deed conveying property to a trust created for the appellant's benefit—but unfortunately, failed to procure a second witness, as Florida law requires. Following the appellant's father's death in 2005, the United States assessed an estate tax on the property—which it said remained in the estate despite the attempted conveyance—and, when the tax remained unpaid, imposed a series of liens. The question here is whether *Summerlin* forestalls enforcement of § 95.231's five-year-cure provision to defeat the United States' estate-tax claim. We hold that it does not. Section 95.231 cured the deed in question, thereby effectuating the intended conveyance and transferring

2

the property out of the father's estate, well before the United States' claim could have vested. The Florida statute, therefore, didn't cut off a preexisting claim in a way that might offend *Summerlin*; rather, it simply—and validly—prevented that claim from coming into being in the first place.

## I

### A

Mark Saccullo has lived on the property at issue here, the site of his childhood home, since 1991. In 1998, Mark's father Anthony, who owned what we'll call "the Property" in fee simple, executed a deed that purported to convey it to the "Anthony L. Saccullo Irrevocable Trust for the benefit of Mark A. Saccullo." For the most part, the deed conformed to the necessary formalities, and it was properly notarized and recorded in December 1998. There was just one glitch: the deed bore the signature of only one witness, not the two required by Fla. Stat. § 689.01. That failure effectively negated the conveyance—at least for the time being, but more on that later—and despite the deed, Anthony retained title to the Property.

When Anthony died in December 2005, Mark became the trustee of his father's irrevocable trust. Mark filed an estate-tax return and—mistakenly it now seems—included the Property among the estate's assets. In 2007, the IRS assessed an estate tax of almost $1.4 million, apparently under the impression that the estate

3

still owned the Property.  Shortly thereafter, Mark, acting in his capacity as trustee, conveyed the Property via quitclaim deed to himself and his wife.

Because the estate-tax liability remained delinquent, the government filed two tax-lien notices with Charlotte County, Florida—one against the estate in 2012, and another against the Property in 2015.  The IRS later administratively seized the Property and unsuccessfully sought to sell it, as the estate-tax liability increased to $1.6 million.

**B**

After the administrative seizure, Mark filed a quiet-title action in the United States District Court for the Middle District of Florida, contending that the liens didn't cover the Property because it was (in fact) not part of his father's estate when he died.[1]  The government counterclaimed, seeking to foreclose on its liens.

The government subsequently moved for summary judgment on its counterclaim arguing, as relevant here, that the Property remained in Anthony's estate, and was thus "subject to [the government's] tax lien" because, as explained above, "the 1998 deed was not properly witnessed."[2]  In opposing the

---

[1] Federal question jurisdiction arises under 28 U.S.C. § 2410, which provides that district courts may hear quiet-title actions concerning property on which the United States has a lien.

[2] The government also argued that the deed was void because it failed to properly identify a grantee.  The district court rejected that argument, and the government does not repeat it here.

government's motion, Mark relied on Fla. Stat. § 95.231, which, in relevant part,

states that

> [f]ive years after the recording of an instrument required to be
> executed in accordance with s. 689.01 . . . from which it appears that
> the person owning the property attempted to convey [the property],
> . . . the instrument . . . shall be held to have its purported effect to
> convey [the property] . . . as if there had been no lack of . . . witness or
> witnesses . . . in the absence of fraud, adverse possession, or pending
> litigation.

Fla. Stat. § 95.231(1).  By dint of that provision, Mark said, "the deed would have

had any defects cured . . . by operation of law" in December 2003, five years after

the deed's initial recording.

The district court granted the government's summary-judgment motion,

holding that despite § 95.231(1) the Property remained in the estate and that the

IRS could therefore foreclose on its liens.  First, the court concluded that

§ 95.231(1) did not create good title in the trust because the deed's missing second

witness was not among the technical defects that the statute operates to cure.

Second, and in any event, the court held that § 95.231(1) is essentially a statute of

limitations, which, under *Summerlin*, does not bind the United States.

Accordingly, the district court ordered foreclosure and sale of the Property and

required Mark to vacate within 30 days.

This appeal followed.[3]  Although we initially denied Mark's motion to stay the order of sale pending our review, we later granted his renewed stay motion and directed the parties to submit supplemental briefing on the question whether Fla. Stat. § 95.231 "is an ordinary statute of limitations that should be subject to the rule set forth in *United States v. Summerlin*, 310 U.S. 414 (1940)."

## II

Before diving too deeply into *Summerlin*, we need to establish a state-law baseline: As a matter of Florida property law, who owned what, and when?  To answer that question, we look first to the text of § 95.231.  Again, in relevant part, that statute provides that, absent exceptions that don't apply here, "[f]ive years after the recording of an instrument required to be executed in accordance with s. 689.01 . . . from which it appears that the person owning the property attempted to convey [the property], . . . the instrument . . . shall be held to have its purported effect to convey [the property] . . . as if there had been no lack of . . . witness or witnesses." Fla. Stat. § 95.231(1).  The statute goes on, in a separate section, to state that "no person shall assert any claim to the property against the claimants under the deed or will or their successors in title" after 20 years.  *Id.* § 95.231(2).

---

[3] Because this appeal comes to us on summary judgment, we review the district court's decision *de novo*.  *United States v. Spoor Tr. Of Louise Paxton Gallagher Revocable Tr.*, 838 F.3d 1197, 1201 (11th Cir. 2016).

Section 95.231's second clause—which cuts off claims after 20 years—plainly falls within *Summerlin*'s ambit, as it is "clearly a limitations statute." *Earp & Shriver, Inc. v. Earp*, 466 So. 2d 1225, 1227 (Fla. 2d Dist. Ct. App. 1985). But this case isn't about the second clause—we are, after all, just now passing the 20-year mark following the 1998 deed's initial recording. Rather, this case turns on the statute's first clause, which, when read in conjunction with the second, makes clear that § 95.231 "is not a traditional statute of limitation but is a curative act with a limitation provision." *Holland v. Hattaway*, 438 So. 2d 456, 461 (Fla. 5th Dist. Ct. App. 1983). The question we must answer is whether *Summerlin* nonetheless applies.

## A

First, a threshold issue: Setting aside the United States' involvement—and for the moment, *Summerlin*—is the witness-related defect here the kind of technicality that § 95.231(1) operates to rectify? The district court held that it isn't. The court reasoned that the statute "cannot be used to create title where none existed" and that the absence of the prescribed number of witnesses rendered the deed statutorily incurable.

That is incorrect, as both parties agree. In its brief to us, the government concedes that "the absence of a required witness signature" did not "invalidate[] the 1998 deed beyond the reach of [the] statute." Section 95.231(1) expressly

7

states that after the requisite five-year period a recorded deed "shall be held to have its purported effect" despite the "lack of . . . witness or witnesses." Thus, at least in the ordinary case, a missing witness is precisely the kind of defect that the statute was designed to cure.

## B

The parties' agreement ends there. They diverge over § 95.231(1)'s operation—in particular when, and how, the statute cures defective deeds. The dispute here turns on § 95.231(1)'s statement that an otherwise-defective deed "shall be held to have its purported effect" five years after it is recorded—and, in particular, how to understand the phrase "shall be held." Fla. Stat. § 95.231(1). Mark contends that the statute's curative properties are automatic and self-executing—and, therefore, that the once-defective 1998 deed was rendered "valid by operation of state law in 2003," five years after the deed was originally recorded. The government, in contrast, asserts that under § 95.231(1)'s language a valid cure requires some form of formal adjudication—either judicial or administrative—before marketable title transfers. As the government put the matter at oral argument, the term "'held' requires a holding." Oral Argument at 13:23.

Both readings are plausible. It's true, as the government asserts, that the "shall be held" language could be understood to supply a rule of decision for an

adjudicative proceeding, such that the phrase indeed "requires a holding." According to one dictionary definition, for instance, "hold" means "to decide in a judicial ruling," as in "the court held that the man was sane." *Webster's Third New International Dictionary* 1078 (2002). But the word "held" is not only, or even principally, court jargon. "[S]hall be held" could just as sensibly be construed to mean something like "shall be considered"—to take just one fairly prominent example, "We hold these truths to be self-evident . . . ." And indeed, the same dictionary that supplies a court-related definition also—and in fact beforehand—defines "hold" to mean "consider, regard, think, judge"—as in "held by many to be the greatest contemporary tennis player." *Id.* *See also, e.g.*, *Oxford English Dictionary Online*, http://www.oed.com (Dec. 28, 2018) (in relevant part, defining "hold" to mean, first, "[t]o accept and entertain as true [or] to believe" or "[t]o think, consider, esteem, regard as," and, alternatively, to mean "[o]f a judge or court: [t]o state as an authoritative opinion [or] to law down as a point of law [or] decide").

Happily, it's not up to us to pick and choose between these competing constructions of § 95.231(1). We are bound by the Florida courts' interpretation of Florida law, *see, e.g.*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), and although the Florida Supreme Court hasn't squarely addressed the specific question before us, the clear weight of Florida authority favors the held-as-"considered" reading.

9

*Earp & Shriver v. Earp*, for instance, involved an appeal from a judgment "declaring void a deed for"—as here—"lack of subscribing witnesses." 466 So. 2d at 1226. The Second DCA reversed, holding—without qualification or intimation that anything further was required—that "[a]fter the requisite passage of time, the statute cured the deficiency in subscribing witnesses." *Id.* at 1227. *Glanville v. Glanville*, 856 So. 2d 1045 (Fla. 5th Dist. Ct. App. 2003), is to the same effect. There, when a grantor sought to invalidate a deed on the ground that it was not properly witnessed and acknowledged, the grantee raised § 95.231(1) as an affirmative defense. Citing *Earp* with approval, the Fifth DCA held that "the statute bar[red] the claim" because the suit "was filed more than five years after the deed was recorded." *Id.* at 1047. Taken together, these cases show that, after five years, the statute not only shields a once-defective deed from judicial attack, but also—of its own force—affirmatively mends it back to health.

We hold, then, that Mark didn't have to go to court to enforce § 95.231(1)'s curative provision. Instead, the deed was "held"—as in considered—"to have its purported effect" by operation of law in December 2003, five years after it was initially recorded.

### III

So where does that leave us vis-à-vis *Summerlin*? Under *Summerlin*, "[w]hen the United States becomes entitled to a claim, acting in its governmental

10

capacity and asserts its claim in that right, it cannot be deemed to have abdicated its governmental authority so as to become subject to a state statute putting a time limit upon enforcement." *Summerlin*, 310 U.S. at 417. Put slightly differently, when a statute of limitations "invalidate[s a] claim of the United States, so that it cannot be enforced at all," the time bar—as against the government, anyway—is unenforceable. *Id*. In the sections that follow, we first review the doctrine and underlying policy of the *Summerlin* rule, and then determine whether the rule applies in this case.

## A

As noted at the outset, the so-called *Summerlin* rule dates to well before the *Summerlin* decision itself. Riding circuit in an early case, Justice Joseph Story invoked the rule and, for support, cited English cases and commentaries stretching back to the 1200s. *See United States v. Hoar*, 26 F. Cas. 329, 330 (C.C.D. Mass. 1821). The "centuries"-old *nullum tempus* principle, he observed, sprang from the concern that the "king is always busied for the public good, and, therefore, has not leisure to assert his right within the times limited to subjects." *Id*. So too in the young Republic, Story continued, there was a "great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers." *Id*. The Supreme Court later agreed, acknowledging that *nullum tempus* survived the Revolution and the founding and inured to the United States as

11

an "incident[] of . . . sovereignty." *United States v. Thompson*, 98 U.S. 486, 489 (1878).

Over time, courts have made clear that *nullum tempus* provides a hedge against, well, bad government. In particular, the rule is founded on the concern that the public suffers when the government sleeps on its rights. *See United States v. Delgado*, 321 F.3d 1338, 1349 (11th Cir. 2003) ("This principle protects public rights vested in the government for the benefit of all from the inadvertence of the agents upon which the government must necessarily rely.") (quotations omitted). Thus, whereas individual citizens can be penalized for inattentiveness in enforcing their rights, the United States cannot be. *See, e.g.*, *Guaranty Trust Co. of N.Y. v. United States*, 304 U.S. 126, 132 (1938) ("Regardless of the form of government and independently of the royal prerogative once thought sufficient to justify it, the rule is supportable now because its benefit and advantage extend to every citizen, including the defendant, whose plea of laches or limitation it precludes.").

Importantly here, the *Summerlin* principle has its limits. In *Guaranty Trust*, for example, the Supreme Court held that the *nullum tempus* rule is inapplicable where the United States has not "acquired a right free of a pre-existing infirmity." 304 U.S. at 142 (citing *United States v. Buford*, 28 U.S. 12, 29 (1830)). There, for instance, because the relevant limitations period had expired *before* the United States acquired the claim it sought to enforce, *nullum tempus* did not apply. *See*

12

*id.*; *see also United States v. California*, 507 U.S. 746, 757–58 (1993) (applying similar logic in a subrogation claim and holding that "*Summerlin* is clearly distinguishable").  As the Ninth Circuit nicely summarized matters in *Bresson v. Commissioner*, "[t]aken together, *Summerlin* and *Guaranty Trust* suggest two countervailing principles."  213 F.3d 1173, 1176 (9th Cir. 2000).  "On the one hand," the court explained, "if the United States comes into possession of a valid claim, that claim cannot be 'cut off' later by a state statute of limitations."  *Id*.  But "[o]n the other hand, if a claim *already has become infirm* (for example, when a limitations period expires) by the time the United States acquires the purported right, the rule of *Summerlin* will not operate to revive the claim."  *Id*.  In short, the *Summerlin* principle can't create rights that do not otherwise exist.

## B

What, then, of this case?  Does *Summerlin* forestall the operation of § 95.231(1) or not?  Because, following Florida's lead, we have held that the statute is self-executing, the question admits of an easy answer.  We hold that *Summerlin* is inapplicable here because, by operation of § 95.231(1), the Property dropped out of the estate in December 2003, five years after the deed was originally recorded—and, importantly, roughly two years before Anthony died, and thus before any claim asserted by the United States could have accrued.

As already explained, the *Summerlin* principle applies only "[w]hen the United States becomes entitled to a claim." *Summerlin*, 310 U.S. at 417. If a valid claim never materializes—or, as in *Guaranty Trust,* comes with a "pre-existing infirmity"—then *Summerlin* doesn't come into play. 304 U.S. at 142. Just so here. The United States' claim to Anthony's estate accrued, at the earliest, when he died in December 2005. But by operation of § 95.231(1), Mark had acquired good title to the Property two years earlier, in December 2003—five years after the defective deed was recorded. Accordingly, we do not have here "a situation in which a valid cause of action had accrued to the United States only to perish later through the passage of time." *Bresson*, 213 F.3d at 1178. Rather, § 95.231(1) prevented the Property from becoming part of the United States' "claim" in the first place.

Not only is this case not within the letter of the *Summerlin* rule, it is not within its spirit, either. This isn't a situation in which the United States missed out on a claim because some government employee was asleep at the switch and negligently let a clock run out. Because Mark's father didn't die until 2005, no amount of diligence on the part of the IRS could have made it possible for the government to acquire a valid estate-tax claim before the deed was statutorily cured in 2003. As in *Guaranty Trust*, "the circumstances of the present case admit of no appeal" to *Summerlin*'s policy underpinnings, because "[t]here has been no

14

neglect or delay by the United States or its agents, and it has lost no rights by any lapse of time."  304 U.S. at 141.

## IV

In sum, we hold that Fla. Stat. § 95.231(1) cured the deed by operation of law in December 2003, that the Property was at that point validly transferred to the trust, and that *Summerlin* is inapplicable here because by the time the United States asserted its tax lien the Property no longer remained in the estate.  We therefore reverse the district court's entry of summary judgment on the United States' foreclosure claim as to the Property and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**.